# SUPERIOR COURT

James D. Whitaker
vs.  No. 48313
R. C. N. Mfg. Co.

RESCRIPT

July 20, 1925.

CAPOTOSTO, J. This is an action for breach of contract wherein the plaintiff seeks to recover a balance of $8640 for yarn manufactured for and sold to the defendant. The jury returned a verdict for the defendant. The plaintiff moves for a new trial upon the usual grounds and also because of newly discovered evidence.

The plaintiff, a yarn broker with offices in Boston, Massachusetts, on October 11, 1919, placed an order for "15,000 lbs. 30/2 Combed Peeler Skeins 18-19 turns—mercerized twist in the single, laced and banded for mercerizing" with the Lumberton Cotton Mills, of Lumberton, North Carolina. Subsequently, through his son and agent, Dwight T. Whitaker, the plaintiff, on December 1, 1919, entered into a contract with the defendant to furnish it with "10,000 lbs. 30/2 ply Combed Peeler 18-19 turns ball warps 378/6000—thread lease each end and every 500 yds." This order called for a change from a mercerized, or soft twist, to a warp, or hard twist. To this change the Lumberton Company consented, for at the time the plaintiff requested this change it had not begun to manufacture any yarn under Whitaker's original order. In due course shipments of the manufactured product began to reach the defendant company.

The R. C. N. Mfg. Co. is a manufacturer of braid for shoe lacings, located in Pawtucket. The first issue between the parties is as to the nature of the contract which was entered into between the plaintiff and the defendant. The plaintiff, while admitting that he knew that the defendant was engaged in manufacturing braid for shoe laces,

maintains that he sold the defendant yarn of a given description without any warranty, either express or implied, that the yarn to be furnished would be adaptable for that purpose. The defendant, on the other hand, claims that it made its needs and desires expressly known to the defendant's agent when the contract was entered into for the yarn in question; that the plaintiff expressly represented that the yarn to be furnished would be suitable for the desired purpose; and that it, the defendant, relied upon this warranty of adaptability when it signed the contract. The evidence establishes the defendant's contention, namely, that the yarn was not only to be yarn of a certain description and of merchantable quality, but that it was further to be yarn of that particular description suitable to be manufactured into shoe laces. Upon this issue the preponderance of the testimony is clearly in favor of the defendant. As bearing upon this point it is to be noted that while Dwight T. Whitaker, the plaintiff's son· and duly authorized agent, who discussed the terms of the contract and actually closed the deal, was placed upon the witness stand to contradict an immaterial sidelight in the course of events between these parties, not one word was he asked by the plaintiff as to the actual circumstances surrounding the parties at the time of the contract was made.

We start, therefore, with the proposition that the defendant was entitled to receive yarn of a certain description suitable to be manufactured into shoe lace braid. The next question, therefore, is: did the defendant receive the yarn that he was reasonably entitled to under his contract? The issue upon this point between the parties is definite and unequivocal. The plaintiff, while generally maintaining that his real obligation was only to furnish yarn of the given description and of merchantable quality, still attempts in every conceivable way to establish the fact that the yarn which was furnished was in fact adaptable to the purpose for which it was intended and vaguely attempts to suggest that deficiencies in the yarn, if any, might be attributable to a number of causes, such as inexperienced help, old or improperly regulated machinery, or improper dyeing. His testimony, through representatives of the Lumberton Company, was to the effect that the yarn was properly manufactured, that it contained cotton staples of the necessary length, that it was evenly spun and adequately twisted. The defendant, on the other hand, maintained that he had used the first nine warps of the yarn in question (the entire order consisting of 48 warps) and had found the yarn unfit for the purpose at hand; that during the course of manufacture the yarn from these warps kept continually breaking at very frequent intervals, causing a serious delay in production and resulting in the manufacture of an inferior product which ultimately had to be sold to one Morris Adler, Broadway, New York, as waste; that it complained to the plaintiff, who sent his son, Dwight T. Whitaker, to investigate; that a test was made in his presence at the Atlas ' Company in Pawtucket and that the plaintiff's son took two or three bobbins of the alleged defective yarn away with him after the test; that finally, acting through its agents, Conrad and Radalauer, it sought assurances from the plaintiff himself in a meeting in Boston that the future deliveries of the yarn would be as good as three warps which had reached it by express following the nine warps that had proven defective; that the plaintiff suggested at this interview a change of dyers, which was in fact done by the defendants, and that he further promised to secure the requested assurance from the Lumberton Mills, which he did; that it also sent to the plain-

tiff in Boston two bobbins of yarn, one of them containing good yarn and one defective yarn from the shipments which it had received so that the plaintiff might forward them for test and comparison to the Lumberton Mills; that the yarn received by the defendant subsequent to the Boston interview with the plaintiff was as poor in quality as the original shipments; and that consequently to protect its interests the defendant refused to accept the remaining 36 warps of yarn and notified the plaintiff that it held this yarn subject to his orders. The defendant's specific complaint about the yarn is that it was unevenly spun, presenting thick and thin places at frequent and indeterminate intervals; that the twist lacked uniformity and that it was deficient in tensile strength, due principally to the short staple cotton used and the unevenness of the twist. The course of conduct between the parties and the results of the various tests made by the defendant are set forth not only by oral testimony but also by written communications between the parties which were duly introduced in evidence and are marked as exhibits in the case.

The plaintiff's conduct in certain instances reflects such glaring omissions as to cause one to inquire as to the reason or motive underlying his actions. For example, while it is testified positively on behalf of the defendant that plaintiff's son took away two or three bobbins of defective yarn after he was present at a test made at the Atlas Company in Pawtucket, this fact is not denied nor is any satisfactory evidence presented as to the result of any test, if a test were in fact made by the plaintiff in Boston or elsewhere on receiving these samples from his son. Again, the two bobbins, one of acceptable and the other of imperfect yarn, which were sent by the defendant to the plaintiff to be by him forwarded to the Lumberton mills for examination, although

received by the plaintiff some time in June of 1920, were not actually sent to the Lumberton Company until February of 1921, some five months after suit was instituted in this case. Even overloking this delay, there is no evidence as to what test the yarn upon these bobbins was subjected to, and what, if any, conclusion was reached by such an examination. True, the plaintiff sought to introduce in evidence a communication from the Lumberton Company to the plaintiff apparently containing some reference to a test and the conclusion reached as to the yarn on these particular bobbins, which evidence was excluded as pure hearsay and the plaintiff's rights, if any, protected by exception. The unexplainable fact, however, remains that although the plaintiff had two representatives of the Lumberton Mills in court throughout the entire proceedings who were conversant with the various circumstances at issue, neither of them was asked as to whether or not a test of these bobbins had been made, and what the result, if any, showed.

In weighing the plaintiff's statements of what he did or attempted to do, one should not overlook the fact that there were 36 full warps of this rejected yarn in Pawtucket, in both the original and mercerized state, and that he omitted or neglected to use such means as were reasonably within his power to secure a sufficient quantity of the yarn for an adequate test. The plaintiff towards the close of this trial, apparently realizing that some corroborating evidence by way of a test was necessary or expedient, gambled his chances in a most unique way. The two bobbins of yarn which he had received from the defendant in June, 1920, and which he had forwarded to the Lumberton Mills in February, 1921, to be tested, were apparently returned at some later date by the Lumberton Company to the plaintiff. These two partly filled bob-

bins had remained untouched in the possession of the plaintiff or of his attorney from that time until about the very end of the present trial, when the plaintiff went to the Providence Braiding Company and put the remaining yarn on these two bobbins through a test on a braiding machine. A braiding machine operates with forty-four spools of yarn. In the plaintiff's test, therefore, there were 42 spools of good yarn belonging to the Providence Braiding Company and in no way connected with the yarn in question and two spools of the yarn in controversy, one of which was admittedly good. The result of this test of one partly filled bobbin of questionable yarn run with 43 bobbins of good yarn was offered as evidenced by the plaintiff to prove that the thousands of yards of yarn which he had sold to the plaintiff was suitably to make shoe lace braid. Another remarkable feature of this phase of the plaintiff's case came to light when Mr. Hebert, the Superintendent of the Providence Braiding Company, who had supervised this so-called test, declared on cross-examination that he told the plaintiff that the use of only two bobbins of yarn was not a fair test for the breaking strength of any yarn, and further stated that he had not been asked by the plaintiff to examine the yarn either for twist or staple. This heroic eleventh hour attempted rescue of his case by the plaintiff does not commend itself to ordinary common sense.

The plaintiff, through counsel, places a good deal of stress on his letter to the defendant of May 11, 1920, marked plaintiff's exhibit BB, in which he offers to take the yarn back and cancel the contract. He maintains that his attitude as shown in this letter clearly demonstrates his fairness. This might be so were it not for the fact that it is quite apparent, though not directly in evidence, that the cotton market was undergoing an upward movement during the period that the shipments from the Lumberton Mills were the subject of complaint and discussion between the plaintiff and defendant. It is not magnanimous to deprive the defendant of an accrued advantage at a time when he is is in immediate need of a commodity for which he fairly bargained. The defendant refused to accept the plaintiff's offer of cancellation because he wanted the particular yarn the plaintiff had agreed to furnish, even though its delivery might be attended by delay and possible annoyance.

The plaintiff also endeavored to charge the defendant with failure to inspect the yarn within a reasonable time after it was received. This contention, gathered from more or less indefinite testimony throughout the case, is unsustained. The defendant's contract with the plaintiff calls for deliveries of the various shipments to the Home Bleach & Dye Works at Pawtucket. Here the yarn was mercerized, which operation tends to increase its tensile strength, and it then was delivered by the dyers to the defendant for the subsequent processes of winding and braiding. In a superficial way the evidence of the plaintiff suggests that the yarn should have been inspected by the defendant in its original state at the time when it was received at the dye-house. The testimony discloses, however, a number of reasons why this claim is untenable. In the first place, the contract itself shows by its terms that the yarn would not reach the physical control of the defendant until after the dyeing process had been completed and the yarn was ready for manufacture. This the plaintiff knew, for he must be held to know the terms of his own agreement. Again, being a yarn broker of many years standing, it can be reasonably assumed that the plaintiff was familiar with the various customs of the trade. The great preponderance of the evidence shows that

the proper time to inspect and test yarn to be used in making braid is when the yarn is put upon the braiders. This is the time when the yarn was, in fact, tested by the defendant in this case and immediate notice of deficiencies given to the plaintiff. Furthermore, the plaintiff falls into a serious contradiction when his attempted claim of improper inspection and test by the defendant is viewed in the light of his own conduct. When the defendant's representatives, Conrad and Radalauer, went to Boston and brought their complaint directly to the attention of the plaintiff himself, the plaintiff at that time not only did not find any fault with the defendant's method or time of testing the yarn, but went further and suggested that it would be well for the defendant to have the yarn dyed elsewhere. This suggestion was adopted by the defendant by directing that all future dyeing be done at the plant of Mackenzie & McKay, reputable dyers in Pawtucket. The yarn dyed at this dye-house proved as defective as that coming from the Home Bleach & Dye Works. The plaintiff's conduct in this respect constitutes an indirect admission, to say the least, that the proper time for the defendant to inspect and test the yarn which he received under his contract with the plaintiff was after it reached its physical possession for preparation and use upon the braiders.

The plaintiff's amended motion for a new trial sets up a claim of newly discovered evidence. To substantiate this claim the plaintiff files an affidavit signed and sworn to by Mr. Samuel H. Borofsky, a member of the Massachusetts bar, who, while associated with Mr. John Tillinghast of the local firm of Murdock & Tillinghast, personally appeared for the plaintiff and conducted this case throughout the entire proceeding. In this affidavit Mr. Borofsky says that on June 9, 1925, he interviewed one Morris Adler of 693 Broadway, New York City, who informed him that he, Adler, had at no time bought any shoe lace in the braid from the defendant company. Assuming for the time being that the facts set forth in the affidavit are material to the real issue, do they constitute newly discovered evidence? The evidence suggested in this affidavit could be useful only as a possible contradiction of the statement of Arthur M. Radalauer, a witness for the defendant, to the effect that the finished product from the plaintiff's early deliveries of the yarn in question had been sold to Morris Adler of Broadway, New York city, as waste. This testimony was given by Radalauer in the forenoon of June 3, 1925. The following day there was no session owing to the court's engagement elsewhere. On June 5, 1925, the plaintiff, after presenting further evidence in rebuttal, closed his case, the matter was submitted to the jury, and a verdict was received. The plaintiff saw fit to make no investigation of the business relations between the defendant and Morris Adler during this interval of time, nor did he make any request of the court to be granted further time in order that he might have ample opportunity to disprove Radalauer's statement if the time actually at his disposal was in fact too short. The testimony which he now claims to be newly discovered evidence was within the potential power of the plaintiff to secure during the course of this trial, and consequently does not meet the requirements of newly discovered evidence.

The form in which the proposed testimony of Morris Adler is submitted to the court for consideration is also open to serious doubt as to its present validity. An affidavit by Morris Adler himself is one thing; an affidavit by another as to what Morris Adler told him is quite a different matter. The first might be considered as direct evidence of the facts stated;

the second is mere hearsay of what the facts might be.

If we concede that the affidavit presents newly discovered evidence and is proper in form, is the evidence submitted of such relevancy and importance as to justify the granting of a new trial? Taking the facts stated in the affidavit at their face value, the evidence only goes to a collateral issue and tends to raise a question of whether or not it affects the credibility of Radalauer's testimony. To disturb a jury's finding, especially in a case of considerable length and full of technical testimony, in order to allow another jury to scrutinize more carefully, perhaps, the evidence upon a collateral issue of one of many witnesses presented by the opposite side would tend to encourage quibbling and litigation. In this case even if Radalauer were completely effaced from the picture, the plaintiff would stand in no better light because what he did and especially what he failed to do would be in no way altered or affected.

This is not the case where a defendant, having used a portion of the plaintiff's merchandise, refuses to take the balance with the ultimate hope of escaping any payment whatever. The R. C. N. Co. paid the plaintiff the sum of $5184, which, for all practical purposes, is payment in full for the 12 warps of yarn used by the defendant before it was obliged to rescind the contract. The evidence as a whole not only fails to establish by a fair preponderance of the testimony that the plaintiff furnished the defendant the yarn which he had agreed to deliver, but establishes quite clearly that the yarn which was rejected by the defendant and for which the plaintiff now seeks payment was defective and insufficient for the use for which it was represented by the plaintiff to be adaptable.

Motion for new trial denied.

For Plaintiff: Cooney & Cooney and Murdock & Tillinghast and Daniel H. Borofsky.

For Defendant: Thomas P. Corcoran, Waterman & Greenlaw, Charles E. Tilley and Edwin J. Tetlow.